**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 26-CR-12-JMC** |
| **v.** | : | |
| | : | |
| **HENNOK WOLDU,** | : | |
| | : | |
| **Defendant.** | : | |

**<u>UNITED STATES' MEMORANDUM IN AID OF SENTENCING</u>**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing. On April 1, 2025, at approximately 8:00 p.m., Metropolitan Police Department ("MPD") officers stopped the defendant and a second individual, Tsegaye Woldegiorgis, in a black 4 door Honda sedan at the 500 block of Hobart Place, NW, Washington, D.C. Both were wearing dark clothing and ski masks. Recovered from the defendant were two sets of stolen United States Postal Service ("USPS") keys, including postal arrow keys, which provided access to USPS mail and collection boxes. Inside of the Honda sedan were stolen mail and bank checks. The two sets of keys were taken approximately two hours earlier during a gunpoint robbery of a USPS courier at the 4800 block of 3rd Street, NW. On August 6, 2026, the defendant pled guilty to one count of Unlawful Possession of a Postal Service Key (18 U.S.C. § 1704), one count of Unlawful Possession of Stolen Mail (18 U.S.C. § 1708) and one count of Receiving Stolen Property (D.C. Code § 22-3232(c)(1)). For the reasons set forth below, the United States respectfully requests that the Court sentence the defendant to a term of 16 months of incarceration followed by three years of supervised release.

## BACKGROUND

On April 1, 2025, at approximately 5:48 p.m., MPD Fourth District officers responded to the 4800 block of 3rd Street, NW, in response to a call for a robbery. Upon arrival, officers met

with the complainant, a USPS courier. The complainant reported that, while delivering mail at 4803 3rd Street, a suspected approached from behind and stated, "Bro, give me everything, give me the keys." The complainant turned and saw a male wearing all black with a face mask pointing a firearm at the complainant. The suspect then took the complainant's keys—including USPS arrow keys (serial number 7-31397),[1] keys to access buildings along the complainant's postal route and keys to the complainant's USPS vehicle—and the complainant's USPS identification card. The suspect then ran back to a black four-door sedan with tinted windows and fled the scene traveling northbound on 3rd Street.

The complainant described the suspect as a black male, taller than 5'4," with a skinny build.[2] NW. Surveillance footage from a property on the opposite side of the street shows some of the robbery. In the video, a suspect wearing all black with a black mask exited the front passenger door of a black four-door sedan with tinted windows and ran to the front of 4803 3rd Street, where the complainant was delivering mail. Following a brief struggle, the suspect reentered the sedan through the front passenger door, and the vehicle immediately drove off.[3] The vehicle appeared to be damaged above the passenger-side rear wheel well.

---

[1] USPS arrow keys are stolen to be used as instrumentalities in financial crimes such as bank fraud, check fraud, identity theft, and other fraud schemes. These keys allow access to mailboxes and USPS collection boxes that often contain checks, credit cards, checks, incoming identity documents sent from government agencies, and other information and items that are valuable to individuals engaged in the commission of financial fraud. Further, suspects who use arrow keys to access mailboxes oftentimes sell stolen mail, including checks, money orders, credit cards and similar items.

[2] From a review of recovered surveillance footage, it appears that, during the robbery, the complainant was standing on a step at 4808 3rd Street NW, while the suspect was standing on the ground. This may have influenced the complainant's estimation of the of the suspect's height.

[3] Given that the suspect entered and exited from the front passenger door and that the vehicle immediately departed when the suspect reentered, it is likely that the vehicle was driven by a second suspect.

**Figure 1. A still from the surveillance footage. The suspect, who just exited the vehicle, is circled in green. Damage above the passenger-side rear wheel well is circled in red.**



Later that day, at approximately 8:07 p.m., MPD Robbery Suppression Unit investigators were patrolling around the 500 block of Hobart Street, NW. There, investigators encountered a parked black four-door Honda Accord sedan, with no front license plate and a Maryland rear license plate with the alphanumeric number 4FJ7898. Tsegaye Woldegiorgis and the defendant were seated in the driver's seat and front passenger seat, respectively. Both were wearing dark clothing and ski masks. No other individuals were in the vehicle. Recovered from the defendant were the USPS keys taken from the complainant during the robbery as well as mail matter and bank checks that did not belong to the defendant or Woldegiorgis. MPD Sergeant Scott Possinger asked the defendant if he worked for the USPS, and the defendant incorrectly responded, "Yes."

The vehicle appeared to be consistent with the vehicle used in the robbery. Both vehicles were black, had tinted windows, silver colored trim around the border of the side windows as well as similar rear taillights and wheels. Moreover, both vehicles appeared to have similar damage above the passenger-side rear wheel well.

**Figure 2. A photograph of the Honda Sedan. Damage above the passenger-side rear wheel well is circled in red.**



**Figures 3 and 4. The USPS arrow keys (left) and route keys (right) recovered from the defendant.**






Investigators executed various search warrants, including one for the defendant's iCloud account. Recovered from the defendant's account were photographs of what appeared to be stolen mail matter, including identifications and a check for individuals that were not the defendant. Also recovered from the defendant's account were various text messages, including one conversation in which the defendant was discussing the sale of $80, $120 and $150 money orders with an individual named "Arif."

**Figure 5. A photograph of a check associated with a business not related to the defendant.**




**Figure 6. Text messages between the defendant (green) and Arif (blue) regarding the sale of money orders.**



## APPLICABLE SENTENCING GUIDELINES

The United States agrees with the Guidelines calculations in the Presentence Investigation Report ("PSIR"). The defendant pled guilty to three counts—Count One: Unlawful Possession of a Postal Service Key (18 U.S.C. § 1704); Count Two: Unlawful Possession of Stolen Mail (18 U.S.C. § 1708) and Count Three: Receiving Stolen Property (D.C. Code § 22-3232(c)(1)).

It is for this reason that, as part of the plea, the parties agree that the U.S.S.G. § 2B1.1(b)(4) enhancement applies to the Guidelines calculations.[4] The Guidelines calculations should thus be calculated as set forth below:

*Count One: Unlawful Possession of a Postal Service Key, 18 U.S.C. § 1704*

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1 | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(3) | Theft from Another Person | +2 |
| U.S.S.G. § 2B1.1(b)(16) | Possession of Dangerous Weapon | +6[5] |
| U.S.S.G. § 3E1.1(a) | Acceptance of Responsibility | - 2 |
| | **Offense Level** | **12** |

*Count Two: Unlawful Possession of Stolen Mail, 18 U.S.C. § 1708*

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1 | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(3) | Theft from Another Person | +2 |
| U.S.S.G. § 2B1.1(b)(16) | Possession of Dangerous Weapon | +6 |
| U.S.S.G. § 3E1.1(a) | Acceptance of Responsibility | - 2 |
| | **Offense Level** | **12** |

The base offense level for Counts One and Two is 6 under U.S.S.G. § 2B1.1. A two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(3) is applicable here because the defendant possessed stolen USPS keys and mail matter when he was stopped by MPD officers. A six-point

[4] The United States understands that the U.S.S.G. § 2B1.1(b)(4) enhancement would not change the defendant's offense level and agrees with the PSIR author's calculation of the offense level as 14. Regardless, for the reasons set forth above, the United States believes that the enhancement is proper and should thus be applied.

[5] U.S.S.G. § 2B1.1(b)(16) calls for a 2-level increase, but if the resulting offense level is less than level 14, increasing the offense level to 14.

enhancement pursuant to U.S.S.G. § 2B1.1(b)(16) is applicable because a firearm was used to rob the complainant of the USPS arrow key. Two points are deducted for acceptance of responsibility under U.S.S.G. § 3E1.1(a), for a total offense level of 12. With a criminal history score of 0 (Category I), the defendant's Guideline range is 10 months to 16 months.

*Count Three, Receiving Stolen Property, D.C. Code § 22-3232*

The parties and the PSIR author agree that Receiving Stolen Property is a "Group 9" Offense under the D.C. Voluntary Sentencing Guidelines. With a criminal history score of zero (Column A), the defendant's Guideline range is 1 to 12 months.

## APPLICABLE LAW

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies

broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

In addition to the applicable Guidelines range, the Court should consider the factors listed in 18 U.S.C. § 3553(a):

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
> (i) issued by the Sentencing Commission . . .; and
> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –
(A) issued by the Sentencing Commission . . . and
(B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The United States respectfully requests that the Court sentence the defendant to a term of 16 months of incarceration, followed by three years of supervised release. The requested sentence, which is at the top of the Guidelines, reflects the goals of sentencing, including protecting the community from violent crime as well as financial and identity theft.

### I. The Nature and Circumstances of the Offense.

This offense was serious, dangerous and presented a real threat to the public's safety. As an initial matter, the postal key was forcefully taken from the complainant at gunpoint. The evidence in this case as well as the proffer of facts strongly demonstrate that the defendant, at a minimum, was involved in the robbery. And the defendant, as part of the plea, acknowledged that the count to which he pled guilty "involved . . . [the] possession of a dangerous weapon (including a firearm) in connection with the offense[.]" U.S.S.G. § 2B1.1(b)(16).

Not only was the robbery a terrifying act against the complainant, but the risk it posed to the community cannot be understated. The robbery happened in a residential area, which was within the direct vicinity of two schools and a church.

**Figure 7. A Google Maps overhead view of the neighborhood..**




This is (and was) not an isolated industrial area. It is a neighborhood where people live and raise their families. The robbery could have easily escalated into violence. And it is actions such as those involved in this case that contribute to the crime that is plaguing regular people who live in the District. The District of Columbia undoubtably suffers from a comprehensive gun and violent crime problem. As of November 5, 2026, there have been 2,259 illegal firearms recovered since the beginning of the year. *See* MPD Firearm Recoveries Dashboard, https://mpdc.dc.gov/page/firearm-recoveries (last accessed November 5, 2026). Further, to date, there have been 1,104 reported assaults with a dangerous weapon and 1,148 reported robberies—overall, a 12 percent increase in violent crime from 2025. *See* MPD's 2026 Year-to-Date Crime Comparison, https://mpdc.dc.gov/dailycrime (last accessed November 5, 2026).

The defendant also undoubtably presented an economic danger to the community and directly intruded upon the public's sense of security in this regard. The USPS is a pillar of the United States and its infrastructure. Indeed, the foundation of the USPS is enshrined in Article 1, Section 8 of the United States Constitution. Every day, millions of private citizens and businesses rely on the postal system for the delivery of critical items, including, *e.g.*, financial documents,

checks and payments and personal identifying documents. The defendant violated the general public's privacy and sought to enrich himself to the detriment of others. His actions were not abstract. They were problematic and a real public nuisance, particularly during these times when many people are simply struggling to make ends meet and live their lives.

**II. The Defendant's History and Characteristics.**

The defendant's criminal history falls into Category I (District Court) and Column A (Superior Court). Although the defendant has no prior convictions, his conduct in the instant case is egregious and demonstrates that he has no regard for the authority of the criminal justice system. Following the defendant's indictment, the Court set strict, but reasonable conditions regarding his release, including a curfew. The Court also permitted the defendant to seek employment. The defendant, however, failed to abide by his pretrial conditions. The defendant, for example, repeatedly refused to abide by his curfew. And, when questioned about his tardiness, the defendant simply did not provide an explanation, initially lied about his whereabouts, or stated that he was working without providing any proof of employment. The Court and Pretrial ultimately pressed the defendant about his whereabouts, including an evening when the defendant's GPS tracker placed him at the Ronald Reagan airport. In response, the defendant, through counsel, falsely represented that he worked for a company called "Lifted Like Kicks." The defendant represented that he was tasked with procuring rare sneakers from people throughout the country. Accordingly, he claimed that he sometimes had to work late hours and meet with sellers at other locations, including the airport.[6] After looking into the matter, the parties and the Court determined that the defendant was lying. He was not employed by "Lifted Like Kicks" in any capacity, and, without

[6] The United States does not assert that defense counsel acted in bad faith when making representations on behalf of the defendant. Defense counsel has been forthright with both the United States and the Court throughout this case.

hesitation, provided the Court and the Parties with a dishonest explanation. It is for this reason that the Court stepped the defendant back.

Further, the defendant failed to abide by the Court's order that he not engage in drug usage. Not only did the defendant submit multiple positive tests for marijuana, but on February 17, 2026, he was arrested and charged with three counts of unlawful possession of a controlled substance in D.C. Superior Court Case No. 2026 CMD 002480, which is still pending. On that afternoon, at approximately 2:07 p.m., MPD officers pulled over a Ford Taurus vehicle. The vehicle was operated by and registered to Kamau Williams. A second individual Moycreo was the front passenger, and the defendant was the right rear passenger. Recovered from the defendant was a baby bottle containing suspected promethazine. Recovered from a bag on the left rear passenger area was approximately half a pound of marijuana and a medicine bottle containing suspected promethazine. Also recovered from a red bag were four jars of THC wax. Inside of the defendant's backpack was a fraudulent check.[7] What is alarming about this incident is not only that the defendant was arrested while on pretrial release, but that he appeared to be engaging in the same type of criminal behavior involved in the instant matter.

**III. The Need for the Sentence Imposed.**

The requested sentence of 16 months incarceration is sufficient but no greater than necessary to meet the goals of sentencing. The requested sentence will provide a general deterrence as it reflects the seriousness of the defendant's crime as well as the contempt he has displayed towards the Court and the criminal justice system in general. To award a lesser sentence would send a signal to the public that individuals such as the defendant will not face the full consequences

---

[7] It is the undersigned prosecutor's understanding that the arresting officer, MPD Sergeant Jeremy Brady, spoke with the owner of the check, who stated that he did know, or give a check to, the defendant or any of the vehicle's occupants.

of breaking the law, notwithstanding their decision to continue flouting the law designed to protect the safety of our community.

Moreover, and perhaps more importantly, the requested sentence will hold the defendant accountable and hopefully give him pause before engaging in such criminal conduct after his release. Overall, the defendant's behavior while on pretrial supervision demonstrated that he has little, if any, regard for the authority of the Court and the criminal justice system. A sentence at the top of the guideline ranges will unambiguously communicate to him that his conduct will be met with firm and predictable consequences. Keeping the defendant under the Court's supervision thereafter will ensure that the defendant is provided with adequate guidance and oversight while he reintegrates into society.

## CONCLUSION

WHEREFORE, the United States recommends that this Court sentence the defendant to a term of 16 months of imprisonment followed by three years of supervised release. The United States' recommendation is within the applicable sentencing Guidelines and appropriate given the circumstances of the case.

Respectfully Submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: /s/

MICHAEL C. LEE
Assistant United States Attorney
CT Juris No. 436272
601 D Street, NW
Washington, D.C. 20530
202-252-7745
Michael.Lee4@usdoj.gov